## PECK v. UNITED STATES.
### No. 4787.

Circuit Court of Appeals, Seventh Circuit.
April 7, 1933.

Rehearing Denied June 6, 1933.

Gallagher, Rinaker, Wilkinson & Hall and Charles A. Williams, all of Chicago, Ill., for appellant.

Dwight H. Green, U. S. Atty., and Owen A. West, Asst. U. S. Atty., both of Chicago, Ill., for the United States.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge (after stating the facts as above).

Appellant includes in his assignments of error attacks on the sufficiency of the indictment, the rulings of the court excluding evidence by him offered, and the sufficiency of evidence to support the conviction.

Supplementing his criticism of the order of the court overruling his demurrer to the indictment, appellant contends that the court should at least have required the Government to have furnished him with a bill of particulars.

Stripped of repetition and unnecessary legal verbiage, each count of the indictment stated that appellant, while acting as president of the First National Bank of Palatine, and "with intent to injure and defraud" this member bank of the Federal Reserve system, "unlawfully, willfully, knowingly and feloniously did then and there embezzle a large sum of money * * * (the further particulars whereof being to the grand jurors unknown)"; which money, it is alleged, was then and there the bank's property and which came into the possession, care, custody, and control of appellant as its president and by virtue of his fiduciary relationship to said bank. One count fixed the amount embezzled at $4,500 and the date as August 16, 1929. The other count fixed the amount embezzled at $20,665.50 and the date, September 17, 1929.

■ Appellant argues that the indictment failed to allege facts necessary to bring the case within the requirements of the statute, and that it failed to inform him with sufficient particularity of the details of the offense with which he was charged to enable him to intelligently prepare for trial.

With appellant's contentions in regard to the sufficiency of the indictment, we can not agree. The indictment charged the offense in the language of the statute (section 592, title 12, U. S. C.) and contained further allegations showing the fiduciary relationship which existed, etc.

The word "embezzle," as used in this section, has a well defined and well understood meaning. To say that appellant embezzled moneys or property of the bank was to charge him with having converted to his own use moneys or property which had been entrusted to him or had come into his possession when he occupied towards the bank a fiduciary relationship. U. S. v. Britton, 107 U. S. 655, 669, 2 S. Ct. 512, 27 L. Ed. 520; Batchelor v. U. S., 156 U. S. 426, 429, 15 S. Ct. 446, 39 L. Ed. 478; U. S. v. Mason (C. C.) 177 F. 552, 558; U. S. v. Harper (C. C.) 33 F. 471, 474; State v. Hudson, 93 W. Va. 435, 117 S. E. 122; People v. O'Farrell, 247 Ill. 44, 93 N. E. 136; Teston v. State, 50 Fla. 137, 138, 39 So. 787.

■ Where the crime defined by the statute is as specific as it is here, it is sufficient if the indictment charges appellant with its commission in the language of the statute. Jelke v. U. S. (C. C. A.) 255 F. 264, 275. The rule was there stated as follows:

"An indictment is generally sufficient which charges a statutory crime substantially in the words of the statute, except in such cases where other precedents have been firmly established in analogous offenses at common law, or where such a charge would not fairly inform the accused of the nature of the charge preferred against him." [1]

■ In support of his attack on the indictment because of its failure to describe with particularity the property embezzled, appellant, relying upon the language in Moore v. U. S., 160 U. S. 268, 16 S. Ct. 294, 40 L. Ed. 422, argues that an indictment is fatally insufficient which describes the property as a specific sum of money.

Without determining whether the indictment would be fatally defective if it merely charged the embezzlement of "a large sum of money * * * to wit, the sum of $4,500.00," it is sufficient answer to this argument to point out that the indictment, in addition to describing the property as quoted immediately above, also alleges "a further and more particular description thereof being to the grand jurors unknown." This added allegation, under numerous authorities, successfully avoids attack on the indictment for fatal weakness in the respect just noted.[2]

■ *Bill of Particulars.* Such an indictment as we are here considering, while good as against demurrer or a motion to quash, should, however, be supported by a bill of particulars if the defendant requests one. In the instant case a bill of particulars was requested by appellant and refused by the court. This, it seems to us, was an abuse of discretion. Merely to charge an officer of a bank with having embezzled $4,500 would not always inform him of the transaction with sufficient particularity to permit him to prepare properly for trial. True, the date of the embezzlement stated in the indictment helped to identify the transaction upon which the charge of embezzlement was predicated. The prosecution, however, was not required to adhere to the date as alleged, and the accused therefore was not helped a great deal by its insertion.

■■ It does not follow, however, that a reversal of the judgment is necessary because of this abuse of discretion and the court's refusal to order the bill of particulars. The bill should have been furnished, but before this court can direct a reversal, the record should show facts from which we may infer prejudice to appellant by reason of such refusal. In other words, a bill of particulars should be furnished when the indictment gives no more specific information than this one. But we must look to the record to see whether appellant was taken by surprise by the government's proof or did not know what issue to meet or was otherwise prejudiced. People v. Emaus, 207 Mich. 451, 174 N. W. 180; United States v. River Rouge Co., 269 U. S. 411, 46 S. Ct. 144, 70 L. Ed. 339; Linn v. U. S. (C. C. A.) 251 F. 476; Dillard v. U. S. (C. C. A.) 141 F. 303; United States v. Rio Grande Irrigation Co., 184 U. S. 416, 22 S. Ct. 428, 46 L. Ed. 619; Ruling Case Law "Appeal and Error" § 203; Corpus Juris "Appeal and Error" § 2917.

[1] For discussion of form of indictment, see article by Justice Riddell, American Bar Association Journal, vol. 13, page 683.

[2] Bower v. U. S., 296 F. 694 (C. C. A. 9); Williams v. U. S., 275 F. 129 (C. C. A. 9); Sheridan v. U. S., 236 F. 305 (C. C. A. 9); Breese v. U. S., 106 F. 680 (C. C. A. 4); U. S. v. Voorhees (C. C.) 9 F. 143.

An examination of the record in the instant case leaves us with no doubt as to appellant's knowledge of the two transactions upon which the prosecution relied to establish the two embezzlements. He was not surprised by the Government's proof. Neither was he left in darkness as to the charges which he was called upon to meet. The testimony shows that before the bank closed and before appellant resigned as president, the directors had charged him with having collected two mortgages which belonged to the bank, one for $4,500 and the other, the Quindel mortgage for $23,000 (which Peck sold at a discount of 10%), and with having retained the money thus collected. The evidence showed the passing of two checks to appellant, one for $4,500 bearing date of August 16, 1929, and one for $20,665.50 bearing date of September 17, 1929, which corresponded both as to amounts and dates with those set forth in the indictment. The evidence further showed that demand was made of appellant for the payment of both mortgages, and he paid the bank the $4,500 mortgage. The controverted issue over each charge was limited to deductions and conclusions drawn from the fact that appellant received the notes and mortgages, collected them, but did not (promptly at least) turn over the moneys received.

Likewise, the controversy between the parties as to the two alleged embezzlements turns not on a dispute as to the facts surrounding the sale of the mortgage and its collection, etc., but upon appellant's own explanation of what he did with the money and why he thus acted.

We would be better satisfied that no error was committed by the court's wrongfully refusing appellant a bill of particulars if the evidence on the merits of the case more strongly supported the verdict. While we recognize that the jury rather than this court must weigh the evidence and determine the guilt or innocence of one accused of crime, we are none too willing to hold an error harmless if left in doubt as to the guilt of the accused.

In this case the evidence as to one count is not free of doubt. On the other hand the penitentiary sentence was the same on each count and the sentences were made to run concurrently. We must reach our conclusion, however, as to the effect of the erroneous ruling on appellant's demand for a bill of particulars upon the facts bearing upon that issue. It cannot be affected by evidence dealing with an entirely different and unrelated issue. We therefore conclude that there was no prejudice, and therefore no reversible error in the court's refusal to grant the requested bill of particulars.

Appellant argued that the evidence failed to support the verdict. To sustain this contention he points to the fact that the indictment charges the defendant with the embezzlement of a sum of *money,* whereas the most that can be said of the proof is that it showed him to have received *bank checks.* This variance between the allegation and the proof is not fatal. Cooper v. U. S., 58 App. D. C. 325, 30 F.(2d) 567; People v. Gorman, 94 Cal. App. 397, 271 P. 361; McGuire v. People, 83 Colo. 154, 262 P. 1015; People v. Roberts, 85 Cal. App. 697, 259 P. 1009; Brown v. State, 92 Fla. 538, 109 So. 438; Gurley v. State, 157 Ark. 413, 248 S. W. 902; Kent v. State, 143 Ark. 439, 220 S. W. 814.

The argument likewise fails to consider the further testimony that the checks by him received were made payable to him and were by him cashed at another bank and the proceeds deposited to his credit. In other words, the receipt of the check by appellant did not constitute the embezzlement. An endorsement of the check by him was necessary. It was after the check was cashed by the bank to which appellant presented it that embezzlement occurred, if at all. At this time the embezzled property was not the check but the cash realized on it.

Appellant also contends under this head that the evidence utterly failed to show that he acted with any intent to defraud the bank, or that any criminal intent of any kind was present.

The evidence determinative of this issue of intent was such as to necessitate its submission to the jury.

As to the Karrer mortgage (this was the $4,500 transaction referred to in the second count of the indictment), the bank cashier testified that about the middle of August, 1929, he delivered the mortgage to appellant for collection at the latter's request; that a man by the name of Karrer held the title to the property. There was also received in evidence a check for $4,500, bearing date of August 16, 1929, payable to appellant and signed by Karrer. Karrer testified that he wrote the check and gave it to appellant on August 16. There was likewise evidence to show that appellant cashed this check at the Capitol State Savings Bank of Chicago and deposited the proceeds to his own credit. He did not advise the First National Bank of Palatine thereof, but in fact some months later denied that he had collected the mort-

gage. The bank officials, through independent investigation, learned of the payment of the mortgage, made demand upon appellant, and in April, 1930, he made payment to the bank of the amount due.

In reference to the Quindel mortgage (the subject matter of the other embezzlement), the facts are more involved and not so free from controversy. Quindel testified that he was a former director of the First National Bank of Palatine and had borrowed money from it. In 1929 he owed the bank about $4,500 and was also liable, through endorsement, for some $15,000 to $17,000 more. To secure his indebtedness he assigned a first mortgage against one Marthe, which was of the face value of $23,000. This mortgage was at the time deposited with the Chicago Title & Trust Co. to secure the latter's guarantee of title against an outstanding dower right. Quindel said he turned this mortgage over to the First National Bank of Palatine. Appellant sold this mortgage to one McIntosh at a discount of 10%. The deposit of the check in the Continental Illinois Bank and Trust Company by appellant and the credit of same to appellant's account were shown by three separate exhibits.

In order to secure possession of the mortgage, appellant gave a surety bond to the Chicago Title & Trust Co. and secured the surety company by collateral. After the mortgage had been sold to McIntosh and the money deposited by appellant in the third bank, he told the directors that he was still negotiating for its sale. As with the Karrer mortgage, the bank officials made an independent investigation and found that the mortgage had been sold and the purchase money therefor paid to Peck; whereupon the directors demanded of him the payment of the amount by him received. His resignation as president followed.

In fairness to appellant, it should be stated that he disputed, and under oath denied, the incriminating facts tending to show his embezzlement of moneys by him collected for the bank of which he was the president and for which he acted as lawyer. He stated that the bank owed him some $15,000 for moneys advanced when he resigned the presidency; that he had at various times loaned money to the bank; that when he collected the Karrer mortgage he notified the cashier of it and asked him repeatedly to make out a statement and charge his account with this collection. As to the Quindel transaction, he testified that he handled the matter for Quindel and that confusion occurred through two assignments by Quindel; that the mortgage was not collected by him for the First National Bank of Palatine, but that he insisted on turning over to the bank the amount of Quindel's direct indebtedness to the bank. He denied that the First National Bank of Palatine was entitled to any of the proceeds above the amount of this direct indebtedness of Quindel to the bank; he stated that Quindel owed him; that to secure possession of the mortgage from the Chicago Title & Trust Co., he had to give a surety bond of $25,000 and he had to secure such surety company. This was first done by his putting up the stock of a bank in the city of Chicago, which stock however was later sold and he purchased stock of another bank, which stock he deposited as collateral.

Both Quindel and the cashier of the First National Bank of Palatine contradicted appellant's story, and both asserted that the Quindel mortgage was assigned to the bank to secure Quindel's direct and indirect obligations to said bank; that the mortgage was turned over to Peck merely for collection and to satisfy Quindel's indebtedness to the bank.

This extended account of the Quindel transaction is thus given to show that a question of veracity was involved, which required submission to the jury. Determination of the existence of a criminal intent is dependent upon the answer to the question, Was appellant handling the Quindel mortgage for the bank? As against the word of Quindel and the cashier was placed the denial of appellant. Supporting the Government's contention is the formal written assignment of the mortgage by Quindel to the First National Bank of Palatine, concerning which appellant made oral explanation.

To further support his contention that the evidence fails to support the verdict, appellant asserts that there was no evidence that the bank owned the money which was embezzled. This position is rejected on the face of the following testimony. Quindel testified in substance that in July he made an assignment of this Marthe mortgage to the bank to secure his payment to this bank. He didn't expect any money. He owed the bank, and he gave it the mortgage for security. The bank examiner kicked about having so many notes and the bank officials came over and wanted him to assign the mortgage. He said, "All right." The witness Karrer testified that he had two loans at the bank, each for $4,500; that he talked with Mr. Peck and told him that he was ready to take up one loan, and he wrote a check for $4,500 and gave it to Mr. Peck. This evidence amply supported

an ownership by the bank sufficient at least to support a charge of embezzlement.

Appellant's remaining two assignments of error deal with the rejection and admission of evidence. As to the latter we have carefully considered appellant's argument and feel justified in rejecting it without separately discussing the question. As to the former, appellant's counsel says:

"* * * (The court) refused the exhibit of the Karrer account as made by the bank, which account directly disproves the charge of embezzlement of this fund. He refused to permit defendant to prove these advances on which the Karrer payment was credited, both by the defendant and the bank, which advances directly wipe out the charge of criminal intent and concealment."

The record fails to support the first statement.

Failure of both counsel to refer to the pages of the transcript whereon the rulings of the court appear, as required by Rule 22 of this court, has added much to our burden. As we understand appellant, he objects to the ruling of the court which refused his proffered proof (being Exhibit No. 13, page 69) which was a copy of the bank's ledger sheet and which, he contends, shows the Karrer mortgage to have been paid December 7, 1929. The following entry appears on transcript, page 65, indicating that Exhibit 13 was received: "Defendant's exhibits * * * and *13* went to the jury." We have diligently searched the record to find where the offer of this exhibit was made or the ruling of the court thereon.

We have however considered the case as though the exhibit were received, but fail to find anything therein appearing which would help appellant. In the face of the proof by him offered, he is in no position to argue successfully that the mortgage, the proceeds of which the appellant is charged with embezzling, was paid on December 7, 1929. Appellant nowhere in his testimony made such a claim. His contention was and is that the bank owed him money when he collected the Karrer mortgage in issue on August 16, 1929, and he did not make remittance because he asked for a statement of his account with the bank, after notifying the cashier that he had collected that mortgage.

In the face of the testimony by numerous witnesses to the effect that this Karrer mortgage was paid to appellant in August, 1929, and by him paid to the bank in April,

1930, which facts and dates appellant did not deny but explained by asserting a set-off in excess of this amount, he would have much weakened his case to have seriously argued that payment was made on December 7, 1929, and relied upon a bank ledger to disprove his own and the Government's testimony.

The ledger account can be explained on the theory that there were two mortgages, one of which was accurately called the Karrer mortgage and the other, during the trial, was sometimes called the Karrer mortgage and sometimes the Crawford mortgage. Each was for $4,500. The Crawford mortgage covered property which Karrer subsequently purchased. One mortgage appellant collected for the bank, the other mortgage was taken care of by Karrer through negotiations which resulted in the bank's extending the loan. The transaction as shown on the ledger did not refer to the Karrer mortgage which was the subject of this embezzlement.

As to the other rejected evidence, the record showed that appellant was permitted to and did testify fully as to the loans by him made to the bank, as well as to other matters covered by this rejected offer.

The judgment is affirmed.

## On Rehearing.

Justification for further comment upon appellant's contentions raised in his petition for rehearing arises out of the fact that the judgment entered by the clerk of the District Court was upon counts 1 and 2 of the indictment whereas the jury found defendant guilty on counts 2 and 3, and not guilty on counts 1, 4, 5, 6, 7, 8, 9, 10, and 11.

After appellant called this court's attention to the error in the judgment the United States District Attorney appeared in the District Court and called the trial judge's attention to the facts of the case. The minute clerk's memorandum, as well as the judge's recollection, was clear, and the court entered the following nunc pro tunc order:

"This cause coming on to be heard on the motion of the United States Attorney to correct the record in the above entitled cause to speak the truth, notice having been duly served on the defendant through his counsel, and evidence having been heard.

"The Court Doth Find, from memoranda made at the time and in the possession of the Clerk of this Court, that the defendant, Ralph L. Peck, was sentenced to eighteen months on count two and eighteen months on count three

in the indictment in the above entitled cause, said sentences to run concurrently, and to pay a fine of One Thousand Dollars on each of said counts two and three, said fines to be cumulative.

"The Court further finds from the aforesaid memoranda that through error of the Clerk of this Court the record was made to show that the defendant was sentenced on counts one and two instead of on counts two and three.

"It Is Therefore Ordered, Adjudged And Decreed that the record of sentence herein be made to speak the truth, that is, corrected to read that the defendant Ralph L. Peck was and is sentenced to eighteen months on count two and eighteen months on count three, sentences to run concurrently, and to pay a fine of One Thousand Dollars on each of said counts two and three, said fines to be cumulative.

"Enter:

"John P. Barnes, Judge."

A certified copy of the nunc pro tunc order has been filed in this court.

The evidence is overwhelming, by proof appearing in the record, that the judge correctly pronounced sentence upon the two counts upon which appellant was convicted and that the clerical error was made by the clerk who wrote the sentence into the judgment book.

Appellant has, since the entry of the nunc pro tunc order, taken an appeal from it and questioned the right of the District Court to enter such an order.

Concerning the propriety and necessity of the court's promptly correcting the judgment as recorded by the clerk, upon his attention being called to an error on the part of the transcribing clerk, we have no doubt. The case was a proper one for the entry of a nunc pro tunc order. 8 Ruling Case Law, 249; Hammond Hotel & Imp. Co. v. Chicago Title & Trust Co. (C. C. A.) 55 F.(2d) 168. It is clearly a case where the court properly pronounced the sentence and the minute clerk correctly noted the sentence as pronounced. Through a mistake (and proof of the mistake appears in the record), the recording clerk erroneously referred to the number of one of the counts upon which the court pronounced its sentence. That the court could and should correct the entry under such circumstances is too plain for argument.

We have carefully considered other questions raised upon the petition for rehearing, and we are satisfied that they require no comment other than what is found in our original opinion.

The petition for rehearing is denied.